UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ROBERT SPOONER,<br><br>    Plaintiff,<br><br>    v.<br><br>MULTI HULL FOILING AC45 VESSEL "4 ORACLE TEAM USA," et al.,<br><br>    Defendants. | Case No. 15-cv-00692-JCS<br><br>**ORDER GRANTING REQUEST FOR RELEASE OF VESSEL AND VACATING ARREST WARRANT**<br><br>Re: Dkt. No. 25 |

## I. INTRODUCTION

Plaintiff Joseph Spooner brings this admiralty action for wrongful termination of a "maritime services contract," both in personam against Defendant Oracle Racing, Inc. ("Oracle Racing") and in rem against *4 Oracle Team USA*, a hydrofoiling AC45-class racing catamaran (the "Vessel"). Components of an AC45 catamaran have been arrested by the United States Marshal, based on a warrant issued by the Clerk pursuant to Supplemental Rule C(3)(a)(ii) of the Federal Rules of Civil Procedure and this Court's Admiralty Local Rule 3-1(b). Oracle Racing now requests that the arrested property be released. The Court held a hearing on March 17, 2015. For the reasons stated below, Oracle Racing's request is GRANTED, and the arrest warrant issued in this case is VACATED.[1]

## II. BACKGROUND

### A. Factual Background

As relevant background to this action, the Court takes notice of the undisputed facts that (1) the America's Cup is a long-established international sailing competition; (2) Oracle Racing, in conjunction with the Golden Gate Yacht Club, is the defending America's Cup champion after

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

winning the 34th America's Cup on San Francisco Bay in 2013; and (3) the 35th America's Cup will be held in a class of boats other than the AC45, likely 62-foot AC62-class racing catamarans.[2]

### 1. Contract History

Spooner served for eleven years as a sailor for Oracle Racing and its predecessor organizations, which have at times competed under the name Oracle Team USA. *See* FAC ¶ 4. Spooner's previous contracts with Oracle Racing provided that he could not be dismissed without cause. *Id.* ¶ 18 & Ex. F.

After the conclusion of the 34th America's Cup, Oracle Racing's CEO Russell Coutts expressed reluctance to extend a new contract to Spooner for the 35th America's Cup, noting concern that Spooner's age could affect his physical fitness. *Id.* ¶ 14. Spooner had at that time recently turned 40. *Id.* At Coutts' request, Spooner prepared a letter setting forth the reasons he was qualified for the team, including that he had outperformed most of his teammates in physical fitness tests. *Id.* ¶¶ 14−15 & Ex. C. Coutts reconsidered, and offered Spooner a contract with Oracle Racing for the 35th America's Cup. *See id.* ¶ 17. In an email, Coutts told Spooner that he "ha[d] a heads of terms ready" and identified certain "major items," without discussing the contract's terminability. *Id.* ¶ 17−18 & Ex. E. Spooner alleges that he signed the contract "under pressure" due to rumors that Coutts might withdraw unsigned contracts out of frustration with other sailors considering offers from other teams. *Id.* ¶ 19.

The contract at issue is a letter agreement titled "Heads of Terms for AC35—Sailing Team—Joseph Spooner." *Id.* ¶ 20; Simmer Decl. Ex. A ("Contract," dkt. 10-1).[3] It is between Oracle Racing, referenced therein as "OTUSA" (an abbreviation of Oracle Team USA), and Allegro Yachting Ltd. ("Allegro," referenced in the contract as the "Company"), an apparent corporate entity located at a post office box in the United Arab Emirates. *See generally* Contract.

---

[2] At the hearing, Spooner's counsel initially agreed that the America's Cup would be raced in the AC62 class, but later stated that a final decision has not been made. She did not dispute, however, that the America's Cup itself (as opposed to the preliminary America's Cup World Series) would not be held in the AC45 class.

[3] Oracle Racing submitted a copy of the contract during briefing on Spooner's first request for an arrest warrant. The Court took judicial notice of the contract as incorporated by reference in Spooner's Complaint and not subject to any dispute as to authenticity. *See* Order Denying Warrant (dkt. 17) at 9−11.

Spooner signed on behalf of Allegro, listing his title as "Sailing Team Member." *Id.* at 6. The contract states that Allegro "shall procure that [Spooner] shall provide, perform, and deliver such duties and services required of him as a member of the Sailing Team of OTUSA (the 'Services'), reporting to Russell Couts." *Id.* ¶ 5. Nothing in the contract identifies any particular vessel that Spooner would sail. *See generally id.*

In return, Oracle Racing would pay Allegro $7,500 per month from February 1, 2014 through June 30, 2014, and $25,000 per month for the remainder of the contract, as well as a bonus if Oracle Racing successfully defended the America's Cup and Allegro or Spooner "remain[ed] engaged by OTUSA at the expiry date of the appointment." *Id.* ¶ 9. The contract defines the expiry date as "the date that is seven (7) days immediately following the date of the final race of the 35th America's Cup Finals"—"[u]nless terminated earlier in accordance with this Heads of Terms." *Id.* ¶ 3. Paragraph 12, titled "Notice Period," addresses the contract's terminability:

> **Notice Period:** Either OTUSA or the Company may terminate this Heads of Terms *for any reason whatsoever at any time* by giving no less than two (2) weeks' prior written notice of termination.

*Id.* ¶ 12 (emphasis added). The contract also provides that Allegro "acknowledges and accepts (for and on behalf of itself and [Spooner]) that nothing in this Heads of Terms or otherwise guarantees that [Spooner] will be part of the crew for any particular race or regatta in which OTUSA participates, in [America's Cup 35] or otherwise." *Id.* ¶ 5. Excluding signatures, the contract is less than five full pages long. *See generally id.*

Spooner is a citizen of New Zealand and was in New Zealand at the time the contract was executed. FAC ¶ 27. At that time, the parties believed that the 35th America's Cup would take place in the United States. *Id.* ¶¶ 13, 33. Spooner entered the United States in December of 2013 on a visa waiver program, but needed to obtain a visa in order to work in the United States. *Id.* ¶¶ 27–28. With Oracle Racing's assistance, he applied for and obtained an "O-1" visa, which may be issued to an athlete of extraordinary achievement to participate in an athletic event or a series of such events. *Id.* ¶¶ 27–36. The applicable regulations state that "in the case of an O-1 athlete, the event could be the alien's contract," 8 C.F.R. § 214.2(o)(3)(ii), and Spooner presented the contract

3

1  with Oracle Racing as evidence supporting his visa application. FAC ¶ 30. Spooner alleges that
2  although an Oracle Racing employee stated that Spooner would be reimbursed for his expenses
3  obtaining the visa, Oracle Racing has not reimbursed $2,995 that Spooner paid an immigration
4  attorney for that purpose. *Id.* ¶ 34 & Exs. J, K.

5  After obtaining the visa, Spooner conducted repair work on an Oracle Racing AC45 vessel
6  in San Francisco. *Id.* ¶ 39. According to Spooner, he and another teammate were tasked with
7  making repairs while other teammates did not yet have work visas, and he would not have been
8  able to do that work without a visa. *Id.* ¶ 38.

9  In December of 2014, Bermuda was selected as the venue for the 35th America's Cup. *Id.*
10 ¶ 41. Oracle Racing issued a "relocation plan" outlining compensation, travel, and housing
11 arrangements for its employees. *Id.* ¶ 42 & Ex. P. Spooner's correspondence with Oracle Racing
12 indicated that he fell within the "Long Term / Relocation" class of employees for the purpose of
13 the relocation plan. *Id.* ¶¶ 42−43 & Ex. Q.

14 Spooner determined that his relocation compensation would not adequately cover the cost
15 of relocating his family to Bermuda, and requested a salary increase from $25,000 per month to
16 $38,000 per month. *Id.* ¶ 45. Spooner was initially told that compensation was not negotiable, but
17 team manager Tom Slingsby later told Spooner that Coutts and general manager Grant Simmer
18 might be willing to compromise. *Id.* Spooner sent an email to Oracle Racing leadership on
19 January 15, 2015 stating that he had "made a commitment to Oracle Team USA and [was]
20 therefore not prepared to resign," but asking that Oracle Racing provide third-party mediation of
21 his request for greater compensation. *Id.* ¶ 47 & Ex. R.

22 The next day, Simmer sent a letter to Spooner and Allegro stating that Oracle Racing
23 would not increase compensation or provide mediation, and that "in light of [Spooner's] stated
24 position that [he would] not otherwise relocate to Bermuda," Oracle Racing was giving notice of
25 termination of the contract effective January 31, 2015. *Id.* ¶ 48 & Ex. S.

26 **2. Oracle Racing AC45 Vessels**
27 The First Amended Complaint names the "Multi Hull Foiling AC45 Vessel *4 Oracle Team*
28 *USA*" as the in rem defendant. Oracle Racing previously submitted a declaration by Grant Simmer

United States District Court
Northern District of California

1   stating that the only vessel meeting that description currently located in San Francisco was under
2   construction and not launched until after Spooner's termination, and asserts in its Request for
3   Release that a similar vessel that Spooner previously sailed on had been sold to a French team in
4   December of 2014.  Simmer Decl. ¶ 7; Request for Release at 8.  Spooner has stated in two
5   declarations that he sailed on and repaired the San Francisco vessel in 2014, and that a separate
6   vessel—*5 Oracle Team USA*, also known as "Boat 5"—was sold to the French team.  Spooner
7   Opp'n Decl. (dkt. 38-1, under seal) ¶¶ 1−3; *see also* Spooner Am. Decl. (dkt. 15).  Spooner's
8   declaration attaches a photograph of the French team standing around an AC45 bearing the serial
9   number "AC 45 0005."  Spooner Opp'n Decl. ¶ 4 & Ex. A.  Oracle Racing has submitted a
10  declaration by Mark Turner, the team's "Boat Building Manager," stating that "Oracle Racing has
11  included the logo '4 ORACLE TEAM USA' on the outer hull of at least two different AC45
12  yachts—one being [serial number] AC45 0005 and the other being AC45 0012."  Turner Decl.
13  (dkt. 40-1) ¶ 2.  According to Turner, the "4" in the logo is unrelated to the vessel's serial number.
14  *Id.*

15      Spooner states that there has never been "more than one boat with the number 4 marking
16  on the side of the vessel."  Spooner Opp'n Decl. ¶ 10.  He states that, based on photographs taken
17  by the United States Marshal, the vessel that is currently under arrest is the vessel that he
18  previously sailed and worked on.  *Id.* ¶ 7−9.  In addition to the name or logo on the side of the
19  vessel, Spooner states that he recognizes certain modifications that he made to the vessel.  *Id.*
20  Turner, on the other hand, states that Spooner sailed the vessel with serial number 0005 (since sold
21  to the French team), and that based on the Marshal's photographs, he is "able to identify he vessel
22  arrested as being AC45 0012 because of the unique configuration and design of the vessel as it has
23  been extensively modified by Oracle Racing from its original design to create a prototype boat."
24  Turner Decl. ¶¶ 4−5.  No serial number for the arrested vessel is visible in the Marshal's
25  photographs.  *See* Supp'l Warrant Return (dkt. 34, under seal).[4]

---

[4] Spooner filed two additional declarations, without leave of the Court, at approximately 8:30 PM the night before the hearing.  *See* dkt. 41.  Those declarations further address the identity of the arrested vessel.  Because this Order does not reach and need not resolve that issue, the Court need not address whether it would otherwise consider Spooner's unsolicited eleventh-hour

### B. Procedural History

The Court previously denied Spooner's request for a warrant to arrest the Vessel, finding no basis for a maritime lien apparent because the contract at issue could, by its terms, be terminated "for any reason whatsoever at any time." *See generally* Order Denying Warrant (dkt. 17).[5] The Court granted Spooner leave to amend, and Spooner filed his First Amended Complaint on Friday, March 6, 2015. *See generally* 1st Am. Compl. ("FAC," dkt. 19). Later the same day, his attorney filed a declaration of exigent circumstances (dkt. 21), triggering Rule C(3)(a)(ii)'s requirement that the Clerk promptly issue a warrant to arrest the vessel without judicial review. The Clerk issued the warrant that day, and the United States Marshal arrested three shipping containers containing AC45 components meeting the description of the Vessel on Monday, March 9, 2015. *See* Warrant (dkt. 24); Return of Execution (dkt. 26). At Spooner's request, in order to better identify the vessel that had been arrested, the Court ordered the Marshal to file a supplemental warrant return under seal attaching all photographs taken of the containers' contents. *See* Order (dkt. 30); Supplemental Return (dkt. 34, under seal).

The day of the arrest, Oracle Racing filed a Request for Release (dkt. 25). Spooner filed an Opposition on March 11, 2015 (dkts. 36−38), and Oracle Racing filed a Reply on March 13, 2015 (dkt. 40). The Court held a hearing on March 17, 2015.

### C. Claims and Arguments

#### 1. Spooner's First Amended Complaint

Spooner purports to bring five claims in his First Amended Complaint. Four of these address the breach or wrongful termination of his contract, and the fifth concerns reimbursement for expenses incurred to obtain his work visa.

First, Spooner argues that Oracle Racing breached the contract by terminating it without cause. FAC ¶¶ 56−62. Spooner asserts that notwithstanding the contract's express terminability provision, and the "[u]nless terminated earlier" clause in its expiry date, it "does not contain an unequivocal term determining The Contract to be 'at will' and therefore cannot be terminated

---

submission.
[5] *Spooner v. Multi Hull Foiling AC45 Vessel 4 Oracle Team USA*, No. 15-CV-00692-JCS, 2015 WL 833484 (N.D. Cal. Feb. 23, 2015).

without cause." *Id.* ¶ 59.  He contends that the provision setting a term through seven days after the end of the 35th America's Cup, as well as his classification as a "long term" employee during plans for relocation to Bermuda, support an expectation that he would not be terminated without good cause. *Id.* ¶¶ 57, 59.

Second, Spooner argues that his termination violated public policy, based primarily on the role that the contract played in securing his O-1 visa. *Id.* ¶¶ 63−70.  According to Spooner, his termination violated the policy underlying the applicable visa regulations by increasing the risk that he and his family would become public charges in the United States. *Id.* ¶ 69.  The First Amended Complaint also states, although not specifically in the context of this claim, that Spooner's termination was based on intentional age discrimination. *Id.* ¶ 53.

Spooner's third claim asserts that Oracle Racing violated the implied covenant of good faith and fair dealing by retaliating against him for attempting to negotiate a salary increase, particularly in light of Slingsby's representation that Oracle Racing would likely provide at least a partial increase. *Id.* ¶¶ 71−75.  Spooner also argues that several other factors support this claim, including Oracle Racing's representations to the United States Citizenship and Immigration Services, its alleged age discrimination, and the disconnect between Oracle Racing's stated reason for termination—that Spooner would not relocate to Bermuda without a raise—and Spooner's earlier statement to Oracle Racing that he was not prepared to resign. *See id.* ¶¶ 75−77.

Spooner's fourth claim contends that his "termination was not for cause which is contrary to the express and implied terms of the contract." ¶¶ 80−82.  It appears to be redundant to his first claim. *See id.*

Finally, Spooner's fifth claim asserts that the legal fees he incurred to obtain his work visa constitute "necessaries" under the Federal Maritime Liens Act, 46 U.S.C. § 31342, because the visa was required before he could provide services to the Vessel. *Id.* ¶ 83.  Spooner therefore argues that Oracle Racing's failure to reimburse those expenses creates a maritime lien against the Vessel. *See id.*

In total, Spooner seeks arrest, condemnation, and sale of the Vessel and its equipment, "wages of US$725,000 and double wage penalties," punitive damages, interest, costs of suit, and

1  attorneys' fees.  *Id.* at 31 (prayer for relief).  Presumably Spooner also seeks reimbursement of the
2  $2,995 cost associated with his work visa that underlies his claim for "necessaries," although that
3  is not separately stated in his prayer for relief.  *See id.*

### 2. Arguments

5  This Order focuses on Oracle Racing's arguments that "the Contract did not contemplate
6  Mr. Spooner supplying services to the '4 ORACLE TEAM USA,' a necessary requirement to
7  assert a maritime lien," and that Spooner's "work visa has no connection to any particular vessel."
8  *See* Request for Review at 11−12.  Spooner's Opposition does not squarely address those issues.
9  *See generally* Opp'n.  The parties' remaining arguments, most of which the Court does not reach
10 in this Order, are summarized below.

11 Oracle Racing's Request for Release first argues that Spooner did not meet his burden to
12 show that exigent circumstances supported issuing an arrest warrant without judicial review.
13 Request for Release at 6−7.  Oracle Racing notes that its counsel spoke to Spooner's counsel
14 during the week leading up to the arrest, and Spooner's attorney did not ask when Oracle planned
15 to remove the Vessel from this district or indicate that Spooner intended to file an amended
16 complaint seeking arrest.  *Id.*  According to Oracle Racing, its attorneys would have informed
17 Spooner that it did not plan to remove Vessel earlier than March 11, 2015—five days after
18 Spooner filed his First Amended Complaint—and that those five days would have allowed time
19 for judicial review.  *Id.* at 7.  Oracle Racing also argues, without citation to authority, that "the
20 claim for exigent circumstances is significantly undermined when plaintiff is still entitled to an *in*
21 *personam* claim against Oracle Racing."  *Id.*  Spooner responds that his counsel had good reason
22 to believe the vessel would be moved soon and was unable to contact the Court to determine
23 whether judicial review would be available, and that the five-day period before Oracle Racing
24 intended to move the vessel may have been too short to allow for judicial review and arrest by the
25 United States Marshal.  Opp'n at 2−4; *see generally* Barlow Decl. (dkt. 38-2, under seal).

26 Next, Oracle Racing argues that Spooner failed to describe the vessel he sought with
27 reasonable particularity, asserting that Oracle Racing has operated two AC45-class vessels bearing
28 the name or logo "4 Oracle Team USA."  Request for Release at 7−8.  Further, Oracle Racing

states that one of the two vessels is no longer in the United States and the other was not launched before Spooner's discharge, meaning that neither is subject to a maritime lien in this district. *See id.* at 12. Spooner contends that Oracle Racing built only one *4 Oracle Team USA*, that Spooner sailed and worked on that vessel as part of his contract, and that the same vessel has been arrested by the United States Marshal. Opp'n at 4−6; *see generally* Spooner Opp'n Decl.

Oracle Racing also contends that Spooner's discharge does not constitute a breach of contract, because the contract explicitly granted either party the right to terminate it at any time for any reason. Request for Release at 9−10. Spooner's Opposition expands on the arguments in his First Amended Complaint that the contract was not in fact terminable at will, based on its stated expiry date, Spooner's O-1 visa application, and Oracle Racing's classification of Spooner as a "long term" employee for relocation purposes. Opp'n at 6−11. Spooner argues that the expiry date's qualifying clause—"[u]nless terminated earlier in accordance with this Heads of Terms"—refers not to the provision allowing either party to terminate the contract on two weeks' written notice, but instead to a different provision anticipating that the Heads of Terms would be replaced by a "long-form employment agreement." *Id.* at 7; Contract ¶¶ 3, 20.

Finally, Oracle Racing argues that wrongful discharge in violation of public policy does not give rise to a maritime lien. Request for Review at 10−11. Spooner does not address this issue in his Opposition. Although Spooner cites *Smith v. Atlas Off-Shore Boat Services, Inc.*, 653 F.2d 1057 (5th Cir. 1981), as authority that retaliatory discharge of a seaman can in some circumstances violate public policy and support a cause of action against an employer, he does not contend that the *Smith* court recognized a maritime lien for such a claim. *See* Opp'n at 8−9; *see also* Reply at 4.

In response to the Court's Order asking him to address certain issues in his Opposition, including the appropriate value of a bond to release the Vessel, Spooner argues that the bond should be set at the value of the Vessel, which Spooner believes to be approximately $850,000. Opp'n at 11. Spooner also states that he "is willing to accept an original letter of guarantee signed

1 . . . by an officer of Oracle Corporation[6] to the effect that it guarantees and agrees to pay the

2 amount of any judgment against it up to the current insured value of the subject defendant vessel."

3 *Id.* In its Reply, Oracle Racing argues that Spooner has only alleged a claim of $750,000, and that

4 under the applicable federal rules, any bond should not exceed that value. Reply at 5 (citing Fed.

5 R. Civ. P. Supp. E(5)).

## III. ANALYSIS

### A. Legal Standard

"Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with [the federal] rules." Fed. R. Civ. P. Supp. E(4)(f). The Third Circuit has discussed the nature of the post-arrest hearing as follows:

> The Supplemental Admiralty Rules do not specify what form the post-arrest hearing must follow. Consequently, the type of proceeding is left to the discretion of the district court. Whether a full adversary hearing with testimony and cross-examination of witnesses in open court is necessary depends on the nature of the issues in controversy.
>
> The post-arrest hearing is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant, and if so, to fix an appropriate bond. Generally speaking, an exhaustive adversarial hearing is not necessary for resolution of those issues. Thus, in many instances we would expect that an informal proceeding, perhaps in the nature of a conference before the district court, supplemented by affidavits and legal memoranda as directed by the court might be sufficient.

*Salazar v. Atl. Sun*, 88 F.2d 73, 79−80 (3d Cir. 1989). In a 2007 decision, Judge Alsup further explained the plaintiff's burden at a post-arrest hearing:

> The purpose of this hearing is not to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant. At this stage in the proceedings, plaintiff merely needs to show probable cause for the issuance of the warrant and writ. This

---

[6] The relationship between Oracle Corporation and Oracle Racing is not clear from the record of this case. The Court understands Oracle Corporation to be a corporate sponsor of Oracle Racing.

10

> "probable cause" requirement translates roughly to requiring that plaintiff show entitlement to a maritime lien.

*Del Mar Seafoods Inc. v. Cohen*, No. C 07-02952WHA, 2007 WL 2385114, at *3 (N.D. Cal. Aug. 17, 2007) (granting motion to vacate order of arrest) (citations and internal quotation marks omitted).

The Court must therefore determine whether Spooner has met his burden to show that he is entitled to a maritime lien. As the Ninth Circuit has explained, a maritime lien is available only in limited circumstances.

> A maritime action *in rem* has traditionally been available only in connection with a maritime lien. Claims not creating a maritime lien must be pursued *in personam. The Resolute,* 168 U.S. 437, 440–42, 18 S. Ct. 112, 113–14, 42 L. Ed. 533 (1897). Maritime liens must be construed "*stricti juris,* and cannot be extended by construction, analogy, or inference." *Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 260 U.S. 490, 499, 43 S. Ct. 172, 174, 67 L. Ed. 364 (1923). Consequently, "[t]he only liens recognized today are those created by statute and those historically recognized in maritime law." *In re Admiralty Lines, Ltd.,* 280 F. Supp. 601, 604−05 (E.D. La.1968), *aff'd mem.,* 410 F.2d 398 (5th Cir. 1969).

*Melwire Trading Co. v. M/V Cape Antibes*, 811 F.2d 1271, 1273 (9th Cir.), *amended*, 830 F.2d 1083 (9th Cir. 1987).

> The theoretical basis for the maritime lien rests on the legal fiction that the ship itself caused the loss and may be called into court to make good. Maritime liens arise for the unpaid provision of necessaries, breaches of maritime contracts, unpaid seaman's wages, unpaid cargo freight, preferred ship mortgages, as well as in other circumstances. *See* 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* 496–98 (3d ed. 2001) (listing cognizable maritime liens). Although most maritime liens arise by operation of general maritime law, several are created by statutes, such as the Maritime Lien Act or the Ship Mortgage Act, 46 U.S.C. §§ 31301–31343.

*Ventura Packers, Inc. v. F/V JEANINE KATHLEEN*, 305 F.3d 913, 919 (9th Cir. 2002). The Court therefore considers whether Spooner has shown entitlement to a maritime lien "created by statute or historically recognized in maritime law" against the Vessel. *See Melwire Trading Co.*, 811 F.2d at 1273 (quoting *Admiralty Lines*, 280 F. Supp. at 604−05).

Further, because the warrant in this case was issued without judicial review in response to Spooner's attorney's declaration of exigent circumstances, Spooner "has the burden in any post-arrest hearing under Rule E(4)(f) to show that exigent circumstances existed." Fed. R. Civ. P.

1 Supp. C(3)(a)(ii).

**B.  Spooner's Attorney's Affidavit of Exigent Circumstances Was Reasonable**

Oracle Racing contends that Spooner failed to show exigent circumstances sufficient to issue a warrant without judicial review, and that the arrest should be vacated on that basis. Request for Release at 6−7 (citing Fed. R. Civ. P. Supp. C(3)(a)(ii)); Reply at 2.  Primarily, Oracle Racing argues that if Spooner's attorney Patricia Barlow had asked Oracle Racing when it intended to remove the Vessel from this district, she would have learned that several days remained to seek judicial review.  *See* Request for Release at 7.

Barlow states in her declaration that she secured assistance from a neighbor of Oracle Racing's Pier 80 headquarters to monitor Oracle Racing's activity loading its equipment— including the now-arrested vessel—into shipping containers.  Barlow Decl. ¶ 4(A).  The neighbor reported that Oracle had completed packing its equipment and was beginning to remove containers from the facility in the week leading up to March 9, 2015.  *Id.* ¶ 6(D).  Having learned from internet sources that Oracle Racing had completed its San Francisco training and intended to move operations to Bermuda, Barlow herself visited Pier 80 and observed trucks departing from the facility with shipping containers.  *Id.* ¶¶ 4(D); 6(B)−(C); 6(F)−(J).  Barlow attempted to contact the Court by telephone but was not able to reach the Court's staff.  *Id.* ¶ 3; Opp'n at 2−3.

The Court finds these facts sufficient to support a reasonable belief that Oracle Racing might remove the Vessel from this district if an arrest warrant did not issue.  While communication between counsel is generally to be encouraged, the Court is aware of no authority requiring an in rem plaintiff to inquire with the vessel's owner as to its intentions.  The Court is reluctant to impose such a requirement, recognizing that at least in some circumstances, such discussions could prompt the owner to remove the vessel before the plaintiff is able to obtain a warrant.  Whether Barlow sufficiently exhausted efforts to obtain judicial review is a closer question—it is not clear why she did not file an amended complaint sooner, and there is no indication that she attempted to contact the duty judge when her efforts to contact staff associated with the undersigned magistrate judge were unsuccessful.  Even so, the Court is satisfied that she had reason to believe that the Vessel could leave this Court's jurisdiction on short notice and made

a good faith effort to obtain expedited judicial review before submitting her affidavit of exigent circumstances. The Court therefore declines to vacate the warrant for lack of exigent circumstances.

### C. The Contract Is Not Sufficiently Tied to Any Specific Vessel to Support a Maritime Lien

In the Court's March 9, 2015 Order, the Court instructed Spooner to address questions including "whether the issues raised in the Amended Complaint are *sufficiently tied to any particular vessel* to support an in rem action, and if so, whether that is the vessel that has been arrested." Dkt. 27 at 2 (emphasis added). Although Spooner's Opposition discusses whether the arrested vessel is the same vessel that Spooner had previously sailed on, Opp'n at 4–5, Spooner fails to adequately address whether the contract is sufficiently tied to *any* particular vessel that its breach would support a maritime lien on such vessel.[7]

The Court's Order denying Spooner's initial application for an arrest warrant addressed the issue of whether prospective breach of a seaman's contract to provide maritime services can support a lien. Order Denying Warrant at 6–9. Executory contracts do not generally give rise to maritime liens, and some courts have held that doctrine to bar liens based on wrongful termination if a sailor has been fully compensated for services rendered before he or she was discharged. *Id.* at 6–8 (citing, *e.g.*, *Bunn v. Global Marine, Inc.*, 428 F.2d 40, 48 n.10 (5th Cir. 1970)).[8] The Court nevertheless held that, in at least in some circumstances, "wrongful termination of a seaman's employment contract can support a maritime lien" under Ninth Circuit precedent. Order Denying Warrant at 9 (relying on *Putnam v. Lower*, 236 F.2d 561 (9th Cir. 1956)). It is not clear, however, that wrongful termination of the contract at issue in this case—which does not reference any particular vessel—can support such a lien.

---

[7] As in the Order denying Spooner's initial request for a warrant, the Court again assumes for the sake of argument that Spooner has standing to enforce a contract between Oracle Racing and Allegro—an issue that Spooner's Opposition wholly fails to address despite the Court's instruction that he do so. *See* dkt. 27 at 2; *see generally* Opp'n. One paragraph of Spooner's declaration states that "Allegro Yachting Ltd. is a name I trade under but . . . I was the person hired as a sailor for the team and Oracle Racing, Inc. always paid me my wages into my bank account in New Zealand which is in my name." Spooner Opp'n Decl. ¶ 11.

[8] Spooner's original verified Complaint specifically alleged that he had been paid in full through the termination of his contract on January 31, 2015. Compl. ¶ 15.

13

In *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.*, the Ninth Circuit held that a lessor of shipping containers for use among a fleet of cargo ships—rather than on any particular ship—could not assert a maritime lien against one of the ships, even though the ship in question actually utilized some of the containers. 808 F.2d 697, 703 (9th Cir. 1987). The Ninth Circuit relied on the Supreme Court's decision in *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1 (1920), which under similar circumstances "denied maritime liens sought against vessels that had received coal which had been sold to the vessels' owner on credit." *Foss Launch*, 808 F.2d at 701 (summarizing *Piedmont*). While the holdings in both *Foss Launch* and *Piedmont* rested primarily on the contracts' failure to specify the vessels involved, both contracts also included a non-maritime component: in *Foss Launch*, the shipping containers were also used in "inter-modal" land transportation, 808 F.2d at 702, and in *Piedmont*, "it was clearly understood that the purchasing corporation would apply part of the coal to a nonmaritime use," 254 U.S. at 13.

Although both *Foss Launch* and *Piedmont* dealt in part with the specific wording of the statute governing liens for necessities, the analysis of *Piedmont* relied on the structure and purpose of maritime liens in general. Justice Brandeis, writing for the Court, explained that purpose as follows:

> To hold that a lien for the unpaid purchase price of supplies arises in favor of the seller merely because the purchaser, who is the owner of a vessel, subsequently appropriates the supplies to her use would involve abandonment of the principle upon which maritime liens rest . . . . The maritime lien developed as a necessary incident of the operation of vessels. . . . Since [a ship] is usually absent from the home port, remote from the residence of her owners and without any large amount of money, it is essential that she should be self-reliant—that she should be able to obtain upon her own account needed repairs and supplies. The recognition by the law of such inherent power did not involve any new legal conception, since the ship had been treated in other connections as an entity capable of entering into relations with others, of acting independently and of becoming responsible for her acts. Because the ship's need was the source of the maritime lien it could arise only if the repairs of supplies were necessary; if the pledge of her credit was necessary to the obtaining of them; if they were actually obtained; and if they were furnished upon her credit.

*Piedmont*, 254 U.S. at 8−9. As is relevant here, the maritime lien rests on the legal fiction of a vessel as a distinct legal entity "capable of entering into relations with others, of acting

14

independently and of becoming responsible for her acts." *Id.* at 9; *see also Foss Launch*, 808 F.2d at 701 ("This inference is consistent with the historical vessel-specific character of a maritime lien. Under the law of maritime liens, a vessel is considered to be a distinct entity responsible only for its own debts."); *Ventura Packers*, 305 F.3d at 919 ("The theoretical basis for the maritime lien rests on the legal fiction that the ship itself caused the loss and may be called into court to make good.").

That principle distinguishes Spooner's contract here from the seamen's contracts in *Putnam*. That case concerned a tuna fishing venture, where each of the plaintiff seamen entered a contract titled "Working Share and Contract *on the Tuna Clipper Silver Spray* Owned and Operated by R.J. Tobin" and thereby agreed to serve as crew on a specific ship. *Putnam*, 236 F.2d at 563 n.3 (emphasis added). Under such circumstances, the traditional fiction of the ship as a legal entity operates relatively smoothly: the contracts could be seen as between each plaintiff and the *Silver Spray* itself, secured by the credit of this ship. *See id.*

In the present case, however, the contract provides only that Allegro would procure Spooner to "provide, perform and deliver such duties and services required of him as a member of the Sailing Team of OTUSA." Contract ¶ 5. There is no explicit reference in the contract to a specific vessel, nor is there any evidence that any party understood the contract to relate to services on a specific vessel. Instead, it is undisputed that Oracle Racing operated multiple AC45 racing catamarans, *see* Spooner Opp'n Decl. ¶ 3, and that the main event of the 35th America's Cup would be sailed in a different class of boat entirely, to be designed and constructed later. When Spooner (or, more accurately, Allegro) entered the contract, there was thus no understanding that his services would be provided to "any particular vessel or even for the vessels then composing [Oracle Racing's] fleet." *See Piedmont*, 254 U.S. at 4; *cf. Ventura Packers*, 305 F.3d at 923 (distinguishing *Foss Launch* and *Piedmont* where a plaintiff "provided goods and services directly to each Ship and invoiced each Ship individually"). Further, like the contracts in *Foss Launch* and *Piedmont*, the contract here includes a non-maritime component: under the contract, Spooner would "work from the offices of OTUSA," and would participate in media and publicity obligations including "advertising, victory celebrations, appearances requested by

15

OTUSA's sponsor/partners and media and fundraising events." Contract ¶¶ 6, 15. Accordingly, it is difficult to construe the contract in this case as implicitly between Spooner and a specific AC45 vessel, or as relying on the credit of any given vessel.

At the hearing, Spooner's counsel argued Oracle Racing's possession of two AC45 vessels at the time the contract was signed provides the necessary connection to those two vessels. The Court disagrees. Under the terms of the contract, Spooner could have sailed on either, both, or neither of those vessels. Oracle Racing could have sold either vessel at any time, or purchased new vessels on which Spooner would sail. Further, all parties understood that if Spooner remained on the Oracle Racing team through the America's Cup competition itself, he would likely sail those races on a different class of vessel entirely. Under such circumstances, it would be incongruous to treat all of Spooner's expected future compensation as the debt of a single AC45 that he happens to have previously worked on.

Spooner's counsel also suggested at the hearing that the Ninth Circuit's decision in *Flores v. American Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003), supports the conclusion that a contract for maritime services can give rise to a maritime lien even if the contract is not specific to any particular vessel. That case is not on point because—as Spooner's counsel acknowledged at the hearing—the Ninth Circuit did not address the existence of a lien or the propriety of any arrest, and it is not clear from the court's opinion whether any vessel was in fact arrested. *See generally id.* Nor is it clear whether contracts that the plaintiff fishermen signed specified the vessel or vessels that they would serve on. *See id.* at 908−09. Further, the plaintiffs in that case sought to recover compensation for work actually performed on the vessels at issue, not prospective relief for wrongful termination. *See id.* at 909−10. *Flores* therefore has no bearing on whether Spooner's contract gives rise to a maritime lien.

"Maritime liens must be construed '*stricti juris,* and cannot be extended by construction, analogy, or inference.'" *Melwire Trading*, 811 F.2d at 1273 (quoting *Osaka Shosen Kaisha*, 260 U.S. at 499). This limitation is grounded in policy, based on the potential for surprise and prejudice to third parties: "the maritime lien . . . is secret and may operate to the prejudice of prior mortgagees and other creditors without notice." *Foss Launch*, 808 F.2d at 702. Spooner has cited

16

no case holding that wrongful termination of a "maritime services contract" such as Spooner's—for general services that could include work on any vessel, known or unknown at the time the contract was entered—creates a maritime lien for prospective damages. The Court therefore holds that Spooner's claims for wrongful termination of his contract cannot support a maritime lien, because the contract does not specifically implicate any vessel on which to assert a lien. That Spooner in fact provided crew and repair services to one such vessel (or perhaps to multiple vessels) is of no more consequence than the fact that the containers and coal in *Foss Launch* and *Piedmont* were ultimately used on the vessels at issue in those cases.

### D. Spooner's Visa Is Not Sufficiently Tied to Any Specific Vessel to Support a Maritime Lien

Spooner's Complaint includes one claim under the Federal Maritime Liens Act, 46 U.S.C. § 31342, for necessities provided to the Vessel—specifically, that Oracle Racing failed to reimburse him for legal fees incurred to obtain his work visa. FAC ¶ 83. That statute provides that "a person providing necessaries to a [non-public] vessel on the order of the owner or a person authorized by the owner-- (1) has a maritime lien on the vessel; (2) may bring a civil action in rem to enforce the lien; and (3) is not required to allege or prove in the action that credit was given to the vessel." 46 U.S.C. § 31342(a).

As the Ninth Circuit has explained, "necessaries" encompass a broad range of goods and services:

> Necessaries are defined as "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). The list is not exhaustive, and in fact, modern admiralty jurisprudence interprets "necessaries" broadly, as anything that facilitates or enables a vessel to perform its mission or occupation. *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986); *Farwest Steel* [*Corp. v. Barge Sea Spain 241*, 769 F.2d 620, 623 (9th Cir. 1985)]. The term "necessaries" includes most goods or services that are useful to the vessel and keep her out of danger. See *Equilease*, 793 F.2d at 603. "Necessaries" indubitably include the things a prudent owner would provide to enable a ship to perform her particular function. *Id.*

*Ventura Packers*, 305 F.3d at 923. Although the Court is aware of no authority holding that a work visa falls within this scope, it is conceivable that, in an appropriate case, a work visa for a crew member could be sufficiently "useful to the vessel" to support a lien. *See id.*

17

In this case, however, Spooner's "necessaries" claim suffers from the same defect as his contract claims: the work visa was not provided as a benefit to any specific vessel. Instead, Spooner himself states that "in order for Plaintiff to be able to perform work under the contract in the United States, plaintiff needed to secure a work permit." FAC ¶ 28. Spooner's visa application included, among other documents and information, a copy of the contract and "an explanation of the nature of the America's Cup and the events, training, challenger races and the actual Cup event itself." *Id.* ¶ 31. As previously discussed, the contract is not specific to any vessel, and the events that Spooner described would require him to sail multiple vessels.

Interpreting an earlier, functionally identical version of the applicable statute, the Ninth Circuit held that "Congress intended 'furnishing'[9] to require active forethought or advance identification of particular vessels in relation to 'necessaries' supplied." *Foss Launch*, 808 F.2d at 701. No such identification occurred here in relation to the work visa. Further, "a vessel is considered to be a distinct entity responsible only for its own debts," *id.*, and the visa expenses cannot reasonably be said to be the debt of any one vessel.

While Spooner's work repairing or modifying one of Oracle Racing's AC45s was without question a "necessary" provided to that vessel, Spooner has already been paid for that labor. *See* Original Compl. ¶ 15. If he had not been paid for that work, he would likely be entitled to a lien. The work visa, however, is simply too far removed from the repair work and from any specific vessel to give rise to a maritime lien.

## IV.  CONCLUSION

For the reasons stated above, Oracle Racing's request to release the arrested property is GRANTED, and the arrest warrant issued in this case is VACATED. The United States Marshal is instructed to release the arrested property to Oracle Racing effective immediately.

The Court need not resolve the identity of the arrested vessel, and does not reach the

---

[9] "No substantive change was intended by the amendment which changed the operative verb: '*Providing* has been substituted for *furnishing* for consistency with other laws. This section makes no substantive change to law.'" *Bollinger Quick Repair, Inc. v. M/V Goliath*, 965 F. Supp. 1448, 1453 (D. Or. 1997) (quoting H.R. Rep. No. 100-918 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6104, 6141); *see also Silver Star Enters., Inc. v. Saramacca MV*, 82 F.3d 666, 668 n.2 (5th Cir. 1996).

parties' remaining arguments.  This Order has no effect on Spooner's in personam claims.

**IT IS SO ORDERED.**

Dated: March 18, 2015

_____
JOSEPH C. SPERO
Chief Magistrate Judge