UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ROBERT SPOONER,<br><br>  Plaintiff,<br><br>  v.<br><br>MULTI HULL FOILING AC45 VESSEL "4 ORACLE TEAM USA," et al.,<br><br>  Defendants. | Case No. 15-cv-00692-JCS<br><br>**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Re: Dkt. No. 44 |

## I. INTRODUCTION

Plaintiff Joseph Spooner brought this admiralty action for wrongful termination of a "maritime services contract" both in personam against Defendant Oracle Racing, Inc. ("Oracle Racing") and in rem against *4 Oracle Team USA*, a hydrofoiling AC45-class racing catamaran. The Court previously ordered the United States Marshal to release the in rem defendant vessel, *see* Order Vacating Warrant (dkt. 43),[1] and Spooner has withdrawn his in rem claim, *see* Opp'n (dkt. 50) at 9. Oracle Racing now moves to dismiss. *See* Mot. (dkt. 44). The Court held a hearing on May 15, 2015, but stayed ruling on the Motion based on the parties' representation that mediation could be fruitful. On August 7, 2015, the parties notified the Court that they were unable to reach a settlement. Joint Status Report (dkt. 60). For the reasons stated below, Oracle Racing's Motion is GRANTED, and Spooner's First Amended Complaint is DISMISSED with prejudice. **The case management conference set for August 14, 2015 is hereby VACATED.** The Clerk is instructed to enter judgment in favor of Defendant Oracle Racing, Inc. and close the file.[2]

---

[1] *Spooner v. Multi Hull Foiling AC45 Vessel "4 Oracle Team USA"*, No. 15-cv-00692-JCS, 2015 WL 1262909 (N.D. Cal. Mar. 18, 2015).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Factual Background

As relevant background to this action, the Court takes notice of the undisputed facts that (1) the America's Cup is a long-established international sailing competition; and (2) Oracle Racing, in conjunction with the Golden Gate Yacht Club, is the defending America's Cup champion after winning the 34th America's Cup on San Francisco Bay in 2013.

Spooner served for eleven years as a sailor for Oracle Racing and its predecessor organizations, which have at times competed under the name Oracle Team USA. *See* 1st Am. Compl. ("FAC," dkt. 19) ¶ 4. Spooner's previous contracts with Oracle Racing provided that he could not be dismissed without cause. *Id.* ¶ 18 & Ex. F.

After the conclusion of the 34th America's Cup, Oracle Racing's CEO Russell Coutts expressed reluctance to extend a new contract to Spooner for the 35th America's Cup, noting concern that Spooner's age could affect his physical fitness. *Id.* ¶ 14. Spooner had at that time recently turned 40. *Id.* At Coutts' request, Spooner prepared a letter setting forth the reasons he was qualified for the team, including that he had outperformed most of his teammates in physical fitness tests. *Id.* ¶¶ 14−15 & Ex. C. Coutts reconsidered, and offered Spooner a contract with Oracle Racing for the 35th America's Cup. *See id.* ¶ 17. In an email, Coutts told Spooner that he "ha[d] a heads of terms ready" and identified certain "major items," without discussing the contract's terminability. *Id.* ¶ 17−18 & Ex. E. Spooner alleges that he signed the contract "under pressure" due to rumors that Coutts might withdraw unsigned contracts out of frustration with other sailors considering offers from other teams. *Id.* ¶ 19.

The contract at issue is a letter agreement titled "Heads of Terms for AC35—Sailing Team—Joseph Spooner." *Id.* ¶ 20; Simmer Decl. Ex. A ("Contract," dkt. 10-1).[3] It is between Oracle Racing, referenced therein as "OTUSA" (an abbreviation of Oracle Team USA), and Allegro Yachting Ltd. ("Allegro," referenced in the contract as the "Company"), an apparent

---

[3] Oracle Racing submitted a copy of the contract during briefing on Spooner's first request for a vessel arrest warrant. The Court took judicial notice of the contract as incorporated by reference in Spooner's Complaint and not subject to any dispute as to authenticity. *See* Order Denying Warrant (dkt. 17) at 9−11. The contract remains subject to judicial notice for the same reasons.

2

corporate entity located at a post office box in the United Arab Emirates. *See generally* Contract. Spooner signed on behalf of Allegro, listing his title as "Sailing Team Member." *Id.* at 6. The contract states that Allegro "shall procure that [Spooner] shall provide, perform, and deliver such duties and services required of him as a member of the Sailing Team of OTUSA (the 'Services'), reporting to Russell Couts." *Id.* ¶ 5.

In return, Oracle Racing would pay Allegro $7,500 per month from February 1, 2014 through June 30, 2014, and $25,000 per month for the remainder of the contract, as well as a bonus if Oracle Racing successfully defended the America's Cup and Allegro or Spooner "remain[ed] engaged by OTUSA at the expiry date of the appointment." *Id.* ¶ 9. The contract defines the expiry date as "the date that is seven (7) days immediately following the date of the final race of the 35th America's Cup Finals"—"[u]nless terminated earlier in accordance with this Heads of Terms." *Id.* ¶ 3. Paragraph 12, titled "Notice Period," addresses the contract's terminability:

> **Notice Period:** Either OTUSA or the Company may terminate this Heads of Terms *for any reason whatsoever at any time* by giving no less than two (2) weeks' prior written notice of termination.

*Id.* ¶ 12 (emphasis added). The contract also provides that Allegro "acknowledges and accepts (for and on behalf of itself and [Spooner]) that nothing in this Heads of Terms or otherwise guarantees that [Spooner] will be part of the crew for any particular race or regatta in which OTUSA participates, in [America's Cup 35] or otherwise." *Id.* ¶ 5. Excluding signatures, the contract is less than five full pages long. *See generally id.*

Spooner is a citizen of New Zealand and was in New Zealand at the time the contract was executed. FAC ¶ 27. At that time, the parties believed that the 35th America's Cup would take place in the United States. *Id.* ¶¶ 13, 33. Spooner entered the United States in December of 2013 on a visa waiver program, but needed to obtain a visa in order to work in the United States. *Id.* ¶¶ 27−28. With Oracle Racing's assistance, he applied for and obtained an "O-1" visa, which may be issued to an athlete of extraordinary achievement to participate in an athletic event or a series of such events. *Id.* ¶¶ 27−36. The applicable regulations state that "in the case of an O-1 athlete, the event could be the alien's contract," 8 C.F.R. § 214.2(o)(3)(ii), and Spooner presented the contract

1   with Oracle Racing as evidence supporting his visa application. FAC ¶ 30.[4]

2   In December of 2014, Bermuda was selected as the venue for the 35th America's Cup. *Id.*
3   ¶ 41. Oracle Racing issued a "relocation plan" outlining compensation, travel, and housing
4   arrangements for its employees. *Id.* ¶ 42 & Ex. P. Spooner's correspondence with Oracle Racing
5   indicated that he fell within the "Long Term / Relocation" class of employees for the purpose of
6   the relocation plan. *Id.* ¶¶ 42−43 & Ex. Q.

7   Spooner determined that his relocation compensation would not adequately cover the cost
8   of relocating his family to Bermuda, and requested a salary increase from $25,000 per month to
9   $38,000 per month. *Id.* ¶ 45. Spooner was initially told that compensation was not negotiable, but
10  team manager Tom Slingsby later told Spooner that Coutts and general manager Grant Simmer
11  might be willing to compromise. *Id.* Spooner sent an email to Oracle Racing leadership on
12  January 15, 2015 stating that he had "made a commitment to Oracle Team USA and [was]
13  therefore not prepared to resign," but asking that Oracle Racing provide third-party mediation of
14  his request for greater compensation. *Id.* ¶ 47 & Ex. R.

15  The next day, Simmer sent a letter to Spooner and Allegro stating that Oracle Racing
16  would not increase compensation or provide mediation, and that "in light of [Spooner's] stated
17  position that [he would] not otherwise relocate to Bermuda," Oracle Racing was giving notice of
18  termination of the contract effective January 31, 2015. *Id.* ¶ 48 & Ex. S.

19  **B.   Procedural History**

20  The proceedings thus far have focused on Spooner's now-withdrawn in rem claims. After
21  filing his original Complaint (dkt. 1), Spooner sought an arrest warrant for the AC45 vessel
22  *4 Oracle Team USA*. The Court reviewed materials submitted by both Spooner and Oracle
23  Racing, and declined to issue an arrest warrant because the contract at issue could, by its terms, be
24  terminated "for any reason whatsoever at any time," and without any breach of contract there was

---

[4] Spooner alleged that although an Oracle Racing employee stated that Spooner would be reimbursed for his expenses obtaining the visa, Oracle Racing has not reimbursed $2,995 that Spooner paid an immigration attorney for that purpose. *Id.* ¶ 34 & Exs. J, K. That expense served as the basis for Spooner's in rem claim under 46 U.S.C. § 31342, which he has now withdrawn. *See* FAC ¶ 83; Opp'n at 9.

no basis for a lien. *See* Order Denying Warrant (dkt. 17).[5] The Court granted Spooner leave to amend, and Spooner filed his First Amended Complaint on Friday, March 6, 2015. *See* FAC. Later the same day, his attorney filed a declaration of exigent circumstances (dkt. 21), triggering Rule C(3)(a)(ii)'s requirement that the Clerk promptly issue a warrant to arrest the vessel without judicial review. The Clerk issued the warrant that day, and the United States Marshal arrested three shipping containers containing AC45 components three days later. *See* Warrant (dkt. 24); Return of Execution (dkt. 26). The Court granted Oracle Racing's motion to release the arrested property and vacate the arrest warrant, primarily because Spooner's claims were not sufficiently tied to any particular vessel to support a maritime lien. *See* Order Vacating Warrant at 13−18. That Order did not reach the sufficiency of Spooner's in personam claims against Oracle Racing. *See id.* at 19.

### C. Claims of Spooner's First Amended Complaint

Spooner brings five claims in his First Amended Complaint. Four of these address the breach or wrongful termination of his contract, and the fifth, which has now been withdrawn, was an in rem claim concerning reimbursement for expenses incurred to obtain his work visa.

First, Spooner argues that Oracle Racing breached the contract by terminating it without cause. FAC ¶¶ 56−62. Spooner asserts that notwithstanding the contract's express terminability provision, and the "[u]nless terminated earlier" clause in its expiry date, it "does not contain an unequivocal term determining The Contract to be 'at will' and therefore cannot be terminated without cause." *Id.* ¶ 59. He contends that the provision setting a term through seven days after the end of the 35th America's Cup, as well as his classification as a "long term" employee during plans for relocation to Bermuda, support an expectation that he would not be terminated without good cause. *Id.* ¶¶ 57, 59.

Second, Spooner argues that his termination violated public policy, based on the role that the contract played in securing his O-1 visa. *Id.* ¶¶ 63−70. According to Spooner, his termination violated the policy underlying the applicable visa regulations by increasing the risk that he and his

---

[5] *Spooner v. Multi Hull Foiling AC45 Vessel 4 Oracle Team USA*, No. 15-CV-00692-JCS, 2015 WL 833484 (N.D. Cal. Feb. 23, 2015).

family would become public charges in the United States. *Id.* ¶ 69.

Spooner's third claim asserts that Oracle Racing violated the implied covenant of good faith and fair dealing by retaliating against him for attempting to negotiate a salary increase, particularly in light of Slingsby's representation that Oracle Racing would likely provide at least a partial increase. *Id.* ¶¶ 71−75. Spooner also argues that several other factors support this claim, including Oracle Racing's representations to United States Citizenship and Immigration Services, its alleged age discrimination, and the disconnect between Oracle Racing's stated reason for termination—that Spooner would not relocate to Bermuda without a raise—and Spooner's earlier statement to Oracle Racing that he was not prepared to resign. *See id.* ¶¶ 75−77.

Spooner's fourth claim contends that his "termination was not for cause which is contrary to the express and implied terms of the contract." ¶¶ 80−82. It appears to be redundant to his first claim, *see id.*, and both parties analyze it in conjunction with that claim. *See* Mot. at 10; Opp'n at 13.

Finally, Spooner's fifth claim asserted that the legal fees he incurred to obtain his work visa constituted "necessaries" under the Federal Maritime Liens Act, 46 U.S.C. § 31342, because the visa was required before he could provide services to the AC45 catamaran *4 Oracle Team USA*. FAC ¶ 83. Spooner therefore argued that Oracle Racing's failure to reimburse those expenses created a maritime lien against that vessel. *See id.* The Court previously held that the work visa was too tenuously connected to any particular vessel to support a maritime lien, *see* Order Vacating Warrant at 17−18, and Spooner has now withdrawn this claim, *see* Opp'n at 9.

In total, Spooner seeks "wages of US$725,000 and double wage penalties," punitive damages, interest, costs of suit, and attorneys' fees. FAC at 31 (prayer for relief).

### D. Oracle Racing's Present Motion to Dismiss

Oracle Racing now moves to dismiss Spooner's First Amended Complaint. *See generally* Mot. First, Oracle Racing argues that Spooner lacks standing to bring any of his claims because he is not a party to the contract between Oracle Racing and Allegro. Mot. at 2−3. Spooner does not address this issue in his Opposition. *See generally* Opp'n; *see also* Reply at 2.

Oracle Racing next argues that Spooner's first and fourth claims, for breach of contract by

termination without cause, fail to state a claim on which relief can be granted because the contract does not require cause for termination. *See* Mot. at 4−5, 10. Oracle Racing further contends that, under general maritime law, a seaman is employed at will and may be terminated without cause. *Id.* at 4−5. Spooner responds that the termination provision of the contract is equivocal, and that the presumption of at-will employment does not apply where a seaman's contract is for a fixed term. Opp'n at 13−16. He also argues that the contract's role in the issuance of his O-1 work visa indicates that it was for a fixed term and not freely terminable. *Id.* at 16−18.

Oracle Racing argues that Spooner's second claim, for termination in violation of public policy, is barred because the contract specified that Spooner was an independent contractor rather than an employee. Mot. at 5−6. It also argues that maritime law recognizes only narrow exceptions to at-will employment—specifically, termination in retaliation for filing a personal injury action or for reporting a violation of safety regulations—and that Spooner's claims do not fall within the scope of those exceptions. *Id.* at 6−7. Spooner responds that the terms of the contract are not dispositive as to his employment status, and that based on the degree of control exercised by Oracle Racing, Spooner was an employee rather than an independent contractor. Opp'n at 20−21. He also contends that whether maritime law allows a claim for discharge in violation of public policy is fact-specific, and that the circumstances of Spooner obtaining a work visa based on the contract support that claim here. *Id.* at 18−20, 22−23.

Finally, as for Spooner's third claim, Oracle Racing argues that the implied covenant of good faith and fair dealing cannot support a wrongful termination claim where the express contract was terminable at will. Mot. at 8−9. Spooner disputes that, citing a California appellate decision in which the court held "that the longevity of the employee's service, together with the expressed policy of the employer [of adjudicating disputes], operate as a form of estoppel, precluding any discharge of such an employee by the employer without good cause." Opp'n at 24−25 (quoting *Cleary v. Am. Airlines, Inc.*, 111 Cal. App. 3d 443, 456 (1980)) (alteration in Opp'n). Spooner also highlights Slingsby's representation that Oracle Racing would likely grant Spooner some degree of increased compensation, as well as the discrepancy between Oracle Racing's stated reason for terminating Spooner—that he would not relocate without a raise—and Spooner's email

1  to Oracle Racing stating that he was "not prepared to resign." *Id.* at 25−26.  Oracle Racing asserts
2  in its Reply that the *Cleary* case on which Spooner relies was overruled by a subsequent California
3  Supreme Court decision.  Reply at 6−7 (citing *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 350−51
4  (2000)).  The parties also repeat or incorporate their arguments addressing Spooner's status as an
5  employee or independent contractor.  *See* Mot. at 7; Opp'n at 25.

### III.  ANALYSIS

#### A.  Legal Standards

##### 1.  Motion to Dismiss

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(b)(6).[6]  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[6] The Federal Rules of Civil Procedure apply to admiralty proceedings unless inconsistent with the supplemental rules for admiralty proceedings.  Fed. R. Civ. P. Supp. A(2).

1  (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked

2  assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

3  Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient

4  factual allegations to "allow[] the court to draw the reasonable inference that the defendant is

5  liable for the misconduct alleged." *Id.*  (quoting *Twombly*, 550 U.S. at 570).

6       Oracle Racing also invokes Rule 12(b)(1), arguing that Spooner lacks standing to enforce

7  the contract, and the Court therefore lacks jurisdiction to consider his claims.  *See* Mot. at 2−3.

8  Where, as here, a jurisdictional challenge is based on the allegations of a plaintiff's complaint

9  rather than on extrinsic evidence, courts "assume [the plaintiff's] allegations to be true and draw

10  all reasonable inferences in his favor." *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

11  "[T]he inquiry is therefore much like a Rule 12(b)(6) analysis." *See Animal Legal Def. Fund v.

12  HVFG LLC*, 939 F. Supp. 2d 992, 997 (N.D. Cal. 2013).

### 2. Admiralty Law

14       Admiralty jurisdiction is "one of the areas long recognized as subject to federal common

15  law." *Tex. Indus., Inc. v. Radcliffe Materials, Inc.*, 451 U.S. 630, 642 (1981).  However,

16  "Supreme Court cases make it clear that courts in admiralty cases may reach beyond maritime

17  precedents and apply state laws 'absent a clear conflict with the federal [maritime] law.'"

18  *Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1278−79 (1st Cir. 1993) (quoting *Askew v. Am.

19  Waterways Operators, Inc.*, 411 U.S. 325, 341 (1973)).  "When new situations arise that are not

20  directly governed by legislation or admiralty precedent . . . [f]ederal courts may, and often do,

21  look to state statutory law and to precepts of the common law which they 'borrow' and apply as

22  the federal admiralty rule." *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 841 (9th Cir. 2002)

23  (quoting Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 4-1, at 146 (3d ed. 2001)).

### B.  Spooner's Standing to Enforce the Contract

25       Oracle Racing first argues that Spooner lacks standing to bring any claim based on the

26  contract between Oracle Racing and Allegro, because Spooner is not a party to it.  Mot. at 2−3

27  (citing *NovelPoster v. Javitch Canfield Grp.*, No. 13-cv-05186-WHO, 2014 WL 5687344 (N.D.

28  Cal. Nov. 4, 2014) (applying California law)); *see also Hatchwell v. Blue Shield of Cal.*, 198 Cal.

App. 3d 1027, 1034 (1988) ("Someone who is not a party to the contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party."). Spooner has thus far failed to meaningfully address this issue. The Court has noted the question of standing in multiple previous orders, each time assuming for the sake of argument that Spooner has standing to bring his claim. Order Denying Warrant at 11; Order Vacating Warrant at 13 n.7; *see also* Order to File Response (dkt. 27) (instructing Spooner to address this issue in the context of Oracle Racing's request to release the arrested vessel). Spooner's Opposition again fails to address this argument in any way. *See generally* Opp'n. The Court assumes once again for the sake of argument that Spooner has standing to enforce the contract.

### C. First and Fourth Claims: Termination Without Cause in Breach of Contract

Spooner's first and fourth claims allege that Oracle Racing breached its contract with Spooner (or Allegro) by terminating Spooner without cause. As a general rule, a "maritime employer may discharge the seaman for good cause, for no cause, or even, in most circumstances, for a morally reprehensible cause." *Smith v. Atlas Off-Shore Boat Serv., Inc.*, 653 F.2d 1057, 1063 (5th Cir. 1981) (footnote omitted). Here, Spooner argues that the contract between Oracle Racing and Allegro alters this background rule. *See* Opp'n at 14. Under federal common law applied in maritime cases,

> [a] written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. Whenever possible, the plain language of the contract should be considered first.

*Flores v. Am. Seafood Co.*, 335 F.3d 904, 910 (9th Cir. 2003) (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999)) (alteration in original).[7]

---

[7] Both parties base their arguments on federal maritime cases, without addressing the contract's choice-of-law clause stating that it "shall be governed by and construed in accordance with Californian law." Contract ¶ 19. The distinction is immaterial for resolution of the present Motion. *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."). For consistency with the parties' arguments, this Order cites federal common law to the extent applicable.

Here, the contract at issue plainly states that either party "may terminate this Heads of Terms for any reason whatsoever at any time by giving no less than two (2) weeks' written notice of termination." Contract ¶ 12. There is no dispute that Oracle Racing gave Spooner (and Allegro) two weeks' written notice that it was terminating the contract. *See* FAC ¶ 48 & Ex. S.

Spooner seizes on a line from the Fifth Circuit's decision in *Smith* that "a seaman who signs on for a voyage or for a specific term of employment is afforded some protection upon discharge." Opp'n at 14 (quoting *Smith*, 653 F.2d at 1060). According to Spooner, the contract is for a fixed term, or perhaps for the equivalent of a "voyage," based on its provision that it will "automatically expire on the date that is seven (7) days immediately following the date of the final race of the 35th America's Cup Finals." *See* Contract ¶ 3; Opp'n at 12−18.

The Court need not address what rights a seaman has if there is an apparent conflict between a fixed term and a terminable-at-will provision in his contract. There is no such conflict here, because the stated term of the contract includes the explicit condition "*Unless terminated earlier in accordance with these Heads of Terms*." Contract ¶ 3 (emphasis added). Spooner contends that this provision is ambiguous, and refers only to the anticipated (but never fulfilled) replacement of the Heads of Terms with a long-form employment contract. Opp'n at 5−6; FAC ¶ 25. There is no basis for that limitation. The plain language of paragraph 3 states that the contract might be "terminated earlier in accordance with these Heads of Terms," and paragraph 12—just as much a part of the Heads of Terms as any other provision—states that it can be terminated on two weeks' written notice for any reason. *See* Contract ¶¶ 3, 12. The terminability provisions of the contract are not contradictory, ambiguous, or equivocal, and the Court need not address the doctrines Spooner discusses for interpreting ambiguous contracts. *See, e.g.*, Opp'n at 15−16 (discussing doctrine of interpreting ambiguous contract language against the party that drafted the contract).

Spooner also argues that the parties' subsequent conduct is relevant to understanding the contract, citing his own submission of the contract to the United States Citizenship and Immigration Services ("USCIS") in support of his visa application, and Oracle Racing's classification of him as a "long term" employee in the proposed relocation plan. *See id.* at 17−18.

11

But "when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." *Flores*, 335 F.3d 904−10.  There is no reason here to look beyond the clear language of the contract, which allows either party to terminate it for any reason.  Nor can either incident be construed as an agreement to amend the contract.

With respect to the visa application, Spooner does not adequately explain how his own submission of the contract to USCIS, even with Oracle Racing's knowledge, could alter Oracle Racing's rights under the contract.  Even if unilateral action by Spooner could have such an effect, the Court disagrees with Spooner's premise that the applicable visa regulations require any sort of limitation on terminability, as discussed in more detail below in the context of Spooner's second claim.

Although Spooner asserts in his Complaint that the "long term" classification "adds a term [to the contract] that plaintiff was not an at will employee," FAC ¶ 59, that is a legal conclusion that the Court need not accept as true, and Spooner's factual allegations do not render the conclusion plausible.  As Oracle Racing correctly notes in its Reply, the parties never reached an agreement regarding Spooner's relocation to Bermuda.  *See* Reply at 5.  In fact, that dispute appears to have been what led to Spooner's termination and the present action.  To the extent that the relocation plan could be construed as an offer to amend the contract, Spooner did not accept that offer, and the termination letter that Oracle Racing sent to Spooner effectively withdrew it. *See* FAC Ex. R (email from Spooner to Oracle Racing requesting mediation of relocation policy), Ex. S (termination letter).  Even if the relocation plan effectively amended the contract, the mere classification of an employee as "long term" in that context cannot reasonably be construed as altering the employee's at-will status.  At most, it indicates that Oracle Racing had no plans to terminate Spooner or re-relocate him out of Bermuda in the near future.  That falls well short of any agreement to relinquish Oracle Racing's right to terminate Spooner's contract.

As written, the contract allowed Oracle Racing to terminate it for any reason, using exactly the notice procedure that Oracle Racing followed.  Spooner has not plausibly alleged that the parties amended the contract in any material way.  At the hearing, Spooner's counsel stated that the only additional basis—outside of the allegations of the First Amended Complaint—to find that

the contract was amended would be correspondence related to the relocation plan. Spooner's counsel conceded, however, that there was never any agreement between the parties as to the relocation plan. Leave to further amend the Complaint would therefore be futile, and Spooner's first and fourth claims, for termination in breach of contract, are dismissed with prejudice.

### D. Second Claim: Termination in Violation of Public Policy

Spooner's second claim contends that regardless of the contract, Oracle Racing's decision to terminate him is actionable because it contravenes established public policy. FAC ¶¶ 63−70; Opp'n at 18−23.

#### 1. Spooner Has Adequately Alleged That He Was an Employee

Oracle Racing argues that Spooner cannot bring such a claim because he was an independent contractor rather than an employee. Mot. at 5−6 (citing *Varisco v. Gateway Sci. & Eng'g, Inc.*, 166 Cal. App. 4th 1099, 1102 (2008)). Spooner does not dispute the rule under California law that an independent contractor has no claim for termination in violation of public policy, nor does he suggest that any different rule applies under federal maritime law. Spooner instead argues that he has adequately pled that he was an employee, not an independent contractor. Opp'n at 20−22. Both parties base their arguments as to this point on California law.[8]

Whether a plaintiff is an employee or independent contractor depends on the circumstances of the relationship. "Each service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 354 (1989). "Following common law tradition, California decisions . . . uniformly declare that the principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Id.* at 350 (citations, internal quotation marks, and brackets omitted). A number of other "secondary" considerations may also be relevant. *Id.* at 351. Although one such factor is

---

[8] The test under federal law is not materially different for the purpose of this case. Under "the common-law test for determining whether a hired party is an employee," federal courts "consider the hiring party's right to control the manner and means by which the product is accomplished." *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 n.5 (2003) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)).

"whether or not the parties believe they are creating the relationship of employer-employee," *id.*, parties cannot transform an employee into an independent contractor by using magic words in a contract: "the label that parties place on their employment relationship 'is not dispositive and will be ignored if their actual conduct establishes a different relationship.'" *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101 (9th Cir. 2014) (quoting *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 10−11 (2007)); *see also Borello & Sons*, 48 Cal. 3d at 349 ("The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced.").

Here, Oracle Racing is correct that the contract designates Spooner (or Allegro) as an independent contractor. *See* Contract ¶ 16 ("The relationship between [Oracle Racing] and [Allegro] is that of principal and independent contractor . . . ."). The same paragraph of the contract, however, goes on to state:

> The parties acknowledge that, while there [sic] relationship is one of principal and independent contractor, the nature of the Services means that [Spooner] may be . . . treated as member(s) [sic] of the Sailing Team of [Oracle Racing] and accordingly will be required to carry out the Services in a manner which promotes the best interests of [Oracle Racing] and that it may be necessary for [Oracle Racing] to exert a higher than usual degree of control over [Allegro] and/or [Spooner].

*Id.* The contract also requires Spooner to "provide, perform, and deliver such duties and services required of him as a member of the Sailing Team . . . reporting to Russell Coutts (or as otherwise notified by [Oracle Racing] from time to time), such duties to be performed in a timely manner and always in accordance with any instructions issued by or on behalf of [Oracle Racing] from time to time." *Id.* ¶ 5. Finally, the contract was intended to be an "interim agreement pending its substitution with a long-form employment agreement," which would be substantially similar but "modified to reflect the direct employer-employee relationship." *Id.* ¶ 20. There is therefore some reason to believe, based on the contract itself, that Spooner's relationship with Oracle Racing was one of employment in all but name.

On a motion to dismiss, the Court is asked to decide whether Spooner has adequately *pled* an employment relationship—not to determine conclusively the nature of the relationship. The First Amended Complaint states that Spooner "was employed by defendants as a member of the

14

crew," and that Coutts (Oracle Racing's CEO) and James Spithill (the skipper of the AC45 vessel that Spooner sailed on) "directed the means and methods of plaintiff's work as a seaman under The Contract." FAC ¶¶ 12, 21. These allegations, viewed in conjunction with the contract provisions discussed above and incorporated by reference in the Complaint, are sufficient at the pleading stage to plausibly allege an employer-employee relationship, and thus to invoke a theory of recovery that requires such a relationship.

### 2. Spooner Has Not Plausibly Alleged That His Termination Violated Actionable Public Policy

The only public policy that Spooner identifies in the context of this claim, in both his Complaint and his Opposition, relates to his O-1 work visa. *See* FAC ¶¶ 66−69; Opp'n at 20, 22−23. Spooner contends that because the visa was issued for Spooner's participation in an "event," and because at least one Oracle Racing employee knew that Spooner submitted the contract as evidence of the "event," termination without cause frustrates the purpose of the visa regulations. *See* Opp'n at 22−23. That argument is not persuasive for at least two reasons.

First, assuming for the moment that the applicable visa regulations actually require a contract that is not terminable at will, that is not the sort of policy consideration enforceable under maritime law.[9] The leading admiralty case to recognize a claim for discharge in violation of public policy is *Smith*, in which the Fifth Circuit held that despite the general principle of at-will maritime employment, "a discharge in retaliation for the seaman's exercise of his legal right to file a personal injury action against the employer constitutes a maritime tort." *Smith*, 653 F.2d at 1063. Many courts have construed *Smith* narrowly, holding that "[o]nly one exception exists to the general at-will employment rule in maritime law: a seaman may file a personal injury action without retaliation." *E.g.*, *Meaige v. Hartley Marine Corp.*, 925 F.2d 700, 702 (4th Cir. 1991). Even courts that "have interpreted *Smith* more broadly" only go so far as "recogniz[ing] a wrongful discharge cause of action under maritime law where the conditions present perilous dangers for mariners and the general public." *See Baetge-Hall v. Am. Overseas Marine Corp.*, 624

---

[9] Both parties base their arguments on this issue on federal maritime law. To the extent that California law might apply, Spooner has cited no authority that any conflict with the visa regulations would render his termination actionable under California law, either.

1  F. Supp. 2d 148, 157 (D. Mass. 2009) (citing, e.g., *Seymore v. Lake Tahoe Cruises, Inc.*, 888 F.
2  Supp. 1029, 1035 (E.D. Cal. 1995)). Congress has also provided a statutory claim for seamen
3  discharged in retaliation for reporting safety violations to the government, cooperating in
4  government safety investigations, refusing to follow orders that would result in serious injury, or
5  accurately reporting hours worked. 46 U.S.C. § 2114. What these judicial and statutory claims
6  have in common is their focus on the safety of seamen and the public.

7  Spooner cites a Southern District of Texas decision for the proposition that "the primary
8  inquiry is whether public policy considerations in particular factual circumstances are sufficient to
9  override the at-will doctrine." *Borden v. Amoco Coastwise Trading Co.*, 985 F. Supp. 692, 697
10 (S.D. Tex. 1997); *see* Opp'n at 19. He cites no cases, however, that allow a wrongful discharge
11 claim based on a policy unrelated to maritime safety, such as the government efficiency concerns
12 invoked in his Complaint and Opposition. Instead, he quotes Justice Holmes' general statement
13 that "[m]en must turn square corners when they deal with the Government," but takes that out of
14 context from a 1920 Supreme Court case that dealt with the circumstances in which a taxpayer can
15 challenge a tax assessment, which has no bearing on the case at hand. *See* Opp'n at 20; *Rock
16 Island Ark. & La. R.R. Co. v. United States*, 254 U.S. 141, 143 (1920). Absent any authority for
17 doing so, the Court declines to extend admiralty law's wrongful discharge doctrine beyond its
18 roots in public safety.

19 Even if termination in violation of visa regulations were actionable, Spooner has not
20 plausibly alleged that any such violation occurred. Spooner's visa was issued pursuant to 8 U.S.C.
21 § 1101(a)(15)(O)(i), which authorizes admission of "an alien who has extraordinary ability in . . .
22 athletics . . . and seeks to enter the United States to continue to work in the area of extraordinary
23 ability." *See* FAC ¶ 29. The implementing regulations set forth procedures under which "a
24 qualified alien may be authorized to come to the United States to perform services relating to an
25 event or events." 8 C.F.R. § 214.2(o)(1)(i). Spooner notes that the regulatory definition of an
26 "event" provides that "[i]n the case of an O-1 athlete, the event could be the alien's contract," *see
27 id.* § 214.2(o)(3)(ii), and that a petition must include "the beginning and ending dates for the
28 events or activities," *see id.* § 214.2(o)(2)(ii)(C). It is a significant leap, however, to get from

16

1  requirements that an athlete show the terms of his or her employment to a requirement that his or
2  her employment must not be terminable.
3  Spooner cites no authority establishing that an O-1 athlete cannot be employed at will. In
4  fact, the regulations specifically contemplate termination of an O visa holder's employment, and
5  provide that "[i]n the case of an alien . . . whose employment terminates for reasons other than
6  voluntary resignation, the employer whose offer of employment formed the basis of such
7  nonimmigrant status and the petitioner are jointly and severally liable for the reasonable cost of
8  return transportation of the alien abroad." *Id.* § 214.2(o)(16). There is no basis to read into the
9  regulations any prohibition of at-will employment. If anything, this conclusion is bolstered by the
10 very fact that USCIS granted Spooner's visa application, because the contract that Spooner
11 submitted with his application plainly included provision allowing either party to terminate it for
12 any reason. *See* Contract ¶ 12. Spooner's claim for termination in violation of public policy based
13 on the visa regulations discussed above is therefore dismissed without leave to amend.

### E. Third Claim: Breach of the Implied Covenant of Good Faith and Fair Dealing

Spooner's third claim asserts that his termination violates the implied covenant of good faith and fair dealing. There is no question that such a duty applies to admiralty contracts. *See, e.g.*, *Flores*, 335 F.3d at 913. The relevant question is whether the implied covenant creates any cognizable interest in Spooner's continued employment. The parties appear to agree that federal maritime precedent does not address this issue, and that it is appropriate to look to California law for guidance. *See* Mot. at 8−9 & n.4; Opp'n at 24; Reply at 6−7; *Wallis*, 306 F.3d at 841 (noting that courts sitting in admiralty may borrow from state law); *see also* Contract ¶ 19 (choice of law provision designating California law).[10]

The controlling case in California is *Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317 (2000). The California Supreme Court held that "covenant of good faith and fair dealing, implied by law

---

[10] As with Spooner's public policy claim discussed above, Oracle Racing argues that Spooner cannot bring a claim based on the implied covenant of good faith and fair dealing because he was an independent contractor rather than an employee. Mot. at 7 (citing *Varisco*, 166 Cal. App. 4th at 1102). For the reasons previously discussed, Spooner has adequately pled that he was an employee.

17

in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*," and thus "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* at 349−50. The court reaffirmed its earlier decision in *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988), which held "that tort remedies are not available for breach of the implied covenant in an employment contract to employees who allege they have been discharged in violation of the covenant." *Foley*, 47 Cal. 3d at 700. Accordingly, "[p]recisely because employment at will allows the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so." *Guz*, 24 Cal. 4th at 350. In other words, "the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance." *Id.* (quoting *Hejmadi v. AMFAC, Inc.*, 202 Cal. App. 3d 525, 547 (1988)).

This is true even "if the employer terminated the employee in 'bad faith.'" *Id.* at 351. "Where the employment contract itself allows the employer to terminate at will, its motive and lack of care in doing so are, in most cases at least, irrelevant," and "the implied covenant of good faith and fair dealing imposes no independent limits on an employer's prerogative to dismiss employees." *Id.*[11] Spooner cites a California appellate case to the contrary, which held that "the longevity of the employee's service, together with the expressed policy of the employer [to adjudicate disputes], operate as a form of estoppel, precluding any discharge of such an employee by the employer without good cause" based on the covenant of good faith and fair dealing. *Cleary v. Am. Airlines*, 111 Cal. App. 3d 443, 456 (1980). Even setting aside the absence of any indication here that Oracle Racing had any sort of policy regarding employee disputes, the state supreme court in *Guz* expressly disapproved of *Cleary* as failing to properly apply *Foley*. *Guz*, 24

---

[11] The only exception that the *Guz* court acknowledged was that "the covenant prevents a party from acting in bad faith to frustrate the contract's *actual* benefits," and thus "might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned." *Id.* at 353 n.18  As in *Guz*, the Court "confront[s] no such claim here." *Id.*

18

Cal. 4th at 351. Because Spooner's contract provided that it could be terminated for any reason, he has no claim under California law for wrongful discharge in violation of the implied covenant of good faith and fair dealing. This claim is therefore dismissed without leave to amend.

### F. Fifth Claim: In Rem Claim Pursuant to 46 U.S.C. § 31342

Spooner's First Amended Complaint includes a claim under 46 U.S.C. § 31342, which grants a maritime lien to "a person providing necessaries to a vessel" and authorizes such a person to bring a civil in rem action. FAC ¶ 83. Spooner sought to recover costs associated with obtaining a work visa. *Id.* The Court previously held that Spooner's work visa was not sufficiently connected to any particular vessel to constitute a "necessary" and thus could not support a maritime lien under the statute. Order Vacating Warrant at 17−18. To whatever extent this claim may have survived the Court's previous Order, Spooner has now withdrawn it, and the Court need not address it further. *See* Opp'n at 9.

## IV. CONCLUSION

For the reasons discussed above, Oracle Racing's Motion is GRANTED. Spooner's First Amended Complaint is DISMISSED with prejudice. The Clerk is instructed to enter judgment in favor of Defendant Oracle Racing, Inc.

**IT IS SO ORDERED.**

Dated: August 10, 2015

JOSEPH C. SPERO
Chief Magistrate Judge